UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TLALOC MUNOZ, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>EARTHGRAINS DISTRIBUTION, LLC,<br>et al.,<br><br>                Defendants. | Case No.:  22-cv-01269-AJB-AHG<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION AND PAGA SETTLEMENT**<br><br>**(Doc. No. 116)** |

Presently before the Court is Plaintiffs Tlaloc Munoz, Miguel Ruiz, Edgar Corona, and Steven Snavely's ("Plaintiffs") unopposed motion for preliminary approval of class and California Private Attorneys General Act ("PAGA") representative action settlement. (Doc. No. 116.) For the reasons set forth below, the Court **GRANTS** Plaintiffs' motion.

## I.    BACKGROUND

### A.    Factual Background

This putative class and PAGA representative action centers on the alleged misclassification of Plaintiffs as independent contractors instead of employees. (*See generally* Doc. No. 110, Second Am. Compl. ("SAC").) Defendants Earthgrains Distribution, LLC and Bimbo Bakeries USA, Inc. (collectively, "Defendants") produce and

distribute baked goods through a "Direct Store Delivery ('DSD') network." (SAC ¶¶ 15–17.) As a part of this DSD network, Defendants sell the distribution rights of specific geographic areas to "Independent Business Partners" ("IBPs")[1], who Defendants label as "independent contractors" and "franchisees." (Doc. No. 116-1 at 8; SAC ¶ 18.) Through execution of "Distribution Agreements," the IBPs agree "to purchase baked goods products from Earthgrains and sell those products to customers in a designated geographic area." (Doc. No. 116-1 at 8.) Defendants contend the IBPs are independent contractors in control of their own business operations, while Plaintiffs assert they are employees carrying out work within Defendants' usual course of business and over whom Defendants exercise extensive control. (*Id.*) Each named plaintiff contracted with Defendants as IBPs: Munoz from approximately 2014 to 2019, Ruiz from approximately 2014 to 2019, Corona from approximately 2017 to January 2022, and Snavely from 2013 to the present. (*Id.*)

### B.    Procedural Background

On May 18, 2022, Plaintiffs Munoz, Ruiz, and Corona sent a notice letter to the California Labor & Workforce Development Agency ("LWDA"), advising of their intent to pursue a representative PAGA action. (Doc. No. 116-1 at 9; Doc. No. 116-2, Decl. of Shaun Markley ("Markley Decl."), at ¶ 3.) After Plaintiffs Munoz, Ruiz, and Corona filed the initial complaint in state court against Defendants (Doc. No. 1 at 19–35), Defendants removed the action to federal court and concurrently filed their answer (Doc. Nos. 1; 3).

On October 7, 2022, Defendants moved to compel Plaintiffs' claims to arbitration. (Doc. No. 9.) The Court denied Defendants' motion, finding that the parties had not mutually assented to the arbitration clause and that, even if they had, the arbitration clause was unconscionable and could not be preserved via the contract's severability clause. (Doc. No. 18.) Defendants appealed (Doc. Nos. 20; 21), and the Ninth Circuit affirmed (*see* Doc. No. 28-1).

///

---

[1]    The SAC uses the term "Distributors" instead of IBPs. (*See, e.g.*, *id.* ¶ 18.)

On February 26, 2025, the parties attended an early neutral evaluation conference with Magistrate Judge Allison H. Goddard. (Doc. No. 42.) When the case did not settle, Judge Goddard issued a scheduling order. (Doc. No. 43.) The parties commenced and engaged in extensive discovery, including propounding and responding to several rounds of written discovery, issuing subpoenas, producing combined tens of thousands of pages of responsive documents, and attending multiple conferences with Judge Goddard to resolve discovery disputes. (*See* Doc. Nos. 116-1 at 10; 57; 60; 75; 80.)

On May 2, 2025, Plaintiffs amended the complaint to add Plaintiff Snavely.[2] (Doc. No. 52.) Later that month, Defendants filed a motion for summary judgment, seeking to dismiss Plaintiffs' claims with prejudice based on the "Distributor's General Release" each signed upon selling their distribution rights. (Doc. No. 61.) After full briefing, the Court denied Defendants' motion. (Doc. No. 93.)

On November 5, 2025, the day after class certification discovery closed, the parties participated in a full-day mediation session with Michael Russell, a highly experienced and well-regarded class action mediator. (Doc. No. 116-1 at 11.) Although the case did not settle at mediation, the parties continued to negotiate and eventually each accepted a mediator's proposal in December 2025.[3] (Doc. No. 116-1 at 11.) The parties executed a Memorandum of Understanding in January 2026 (*id.*), and Plaintiffs filed the Second Amended Complaint consistent with the Settlement (Doc. No. 110). The SAC asserts ten causes of action: (1) failure to reimburse business expenses (Cal. Lab. Code § 2802); (2) unlawful deductions from wages (Cal. Lab. Code §§ 221–223); (3) failure to provide accurate wage statements (Cal. Lab. Code § 226); (4) failure to pay overtime (Cal. Lab. Code § 510); (5) failure to provide meal periods (Cal. Lab. Code § 226.7); (6) failure to provide rest breaks (Cal. Lab. Code § 226.7); (7) failure to pay wages when due upon

---

[2] Prior to amending the complaint, Snavely sent notice to both LWDA and Defendants of intent to do so. (Doc. No. 116-1 at 9; Markley Decl. ¶ 4.)

[3] Between the mediation and when the parties accepted the mediator's proposal, they fully briefed a motion for class certification. (Doc. Nos. 95; 105; 106.)

22-cv-01269-AJB-AHG

termination (Cal. Lab. Code §§ 201–203); (8) failure to pay sick leave wages (Cal. Lab. Code §§ 245–259); (9) unfair business practices (Cal. Bus. & Prof. Code §§ 17200 et seq.); and (10) penalties under PAGA (Cal. Lab. Code §§ 2698 et seq.). (*See generally* SAC; Doc. No. 116-1 at 9.)

Now, Plaintiffs move for preliminary approval of the settlement. (Doc. No. 116.) Defendants filed a notice of non-opposition. (Doc. No. 118.)

## II.    TERMS OF THE PROPOSED SETTLEMENT

The primary terms of the Settlement (Doc. No. 116-3, Stipulation of Class and PAGA Representative Agreement ("Settlement" or "Settlement Agreement") are provided below:

### A.    Settlement Class

The Settlement defines the "Settlement Class" or "Class Members" as:

> All current and former Independent Business Partners ("IBPs") who contracted with either Defendant, or one of their predecessors, subsidiaries, or affiliates, for sales in sales areas in California, or who were purchasing product in California or selling to customers in California, at any time during the period June 27, 2018 through February 28, 2026.

(Settlement § 1.42; Doc. No. 116-1 at 11–12.) The Class Settlement Period runs from June 27, 2018 through February 28, 2026. (Settlement § 1.6; Doc. No. 116-1 at 12.)

With regard to settlement of the PAGA cause of action, the Settlement defines the "PAGA Members" as "Class Members who contracted with either Defendant or one of their predecessors, subsidiaries, or affiliates for sales in sales areas in California or who were purchasing product in California or selling to customers in for at least one Eligible Pay Period during the PAGA Settlement Period." (Settlement § 1.28; Doc. No. 116-1 at 12.) The PAGA Settlement Period runs from May 18, 2021 through February 28, 2026. (Settlement § 1.30; Doc. No. 116-1 at 12.)

### B.    Settlement Amount

Defendants will pay a non-reversionary $17,500,000 (the "Gross Settlement Amount") within twenty-one days after the Effective Date or within seven days of

22-cv-01269-AJB-AHG

receiving all necessary information from the Settlement Administrator, whichever is later. (Settlement §§ 3.3, 4.9.1.) The "Net Settlement Amount" is "the portion of the Gross Settlement Amount available for distribution to the Participating Class Members," which equals the Gross Settlement Amount less PAGA Payment ($350,000), Reserve Fund ($200,000), attorneys' fees (not to exceed $5,833,333.33), litigation costs (not to exceed $45,000), Settlement Administration Costs (not to exceed $16,000), and the Enhancement Awards ($15,000 to each of the four named plaintiffs). (*Id.* §§ 1.25 (Net Settlement), 3.5.1 (Class Representative Enhancement Awards), 3.5.2 (Attorneys' Fees), 3.5.3 (Settlement Administrator Costs), 3.5.5 (PAGA Payment), 3.5.6 (Reserve Fund).) Each Participating Class Member[4] will receive an Individual Settlement Payment consisting of:

1.      "Minimum Payment," which will "be calculated as fifteen percent (15%) of the Net Settlement Amount divided equally among all Participating Class Members"; and

2.      "Pro Rata Payment," which will "be calculated by taking the remaining eighty-five percent (85%) of the Net Settlement Amount and dividing it among the Participating Class Members on a pro rata basis based on the Eligible Workweeks each Participating Class Member contracted with Defendants during the Class Settlement Period[.]" (*Id.* § 3.5.4.)

The PAGA Payment ($350,000) consists of $262,500 as the LWDA PAGA Payment for penalties and $87,500 as the Individual PAGA Payments to be distributed to the PAGA members "based on a pro rata share based on the number of Eligible Pay Periods each PAGA Member contracted with the Released Parties during the PAGA Settlement Period[.]" (*Id.* § 3.5.5.)

**C.      Releases**

In exchange for Defendants' $17,500,000 payment, Class Members who do not opt out of the Settlement Class release "all federal, state and local law claims, rights, demands,

---

[4]      "Participating Class Members" are those "Class Members who do not timely request to be excluded from the class portion of the settlement." (*Id.* § 1.31.)

22-cv-01269-AJB-AHG

liabilities, penalties and causes of action asserted against the Released Parties in the Action and/or that could have been asserted in the Action based upon the facts set forth in the Action and/or the LWDA letters (as amended) . . . under the laws of any jurisdiction where a given Participating Class Member lived or worked during any portion of the Class Settlement Period." (*Id.* §§ 1.34, 3.7.2.)

In addition to the above release, the Class Representatives additionally agree to the following "complete and general release to the maximum extent by law":

> any and all claims, obligations, demands, actions, rights, causes of action, and liabilities against the Released Parties, of whatever kind and nature, character, and description, whether in law or equity, whether sounding in tort, contract, federal, state and/or local law, statute, ordinance, regulation, common law, or other source of law or contract, whether known or unknown, and whether anticipated or unanticipated, including all unknown claims covered by California Civil Code Section 1542, by the Class Representative, arising at any time up to and including the date on which the Court enters the Order of Final Approval, for any type of relief[.]

(*Id.* §§ 1.8, 3.7.1.) The Class Representatives' release includes an express waiver of Section 1542 of the California Civil Code. (*Id.* §§ 1.8, 3.7.1.) However, the release recognizes that it does not constitute waiver or release of "any claim or right that is not waivable as a matter of law." (*Id.* § 1.8.)

Finally, Participating Class Members who are Current IBPs[5] must execute the Arbitration Agreement in order to receive the Individual Settlement Payment. (*Id.* §§ 3.5.4, 4.11.) The Arbitration Agreement is a version revised in an effort to eliminate the substantive issues Plaintiffs raised earlier in the case. (Doc. No. 116-1 at 12.) Current IBPs may execute the Arbitration Agreement on paper or electronically through the settlement website. (Settlement §§ 4.2.2–4.2.3.) "If a Current IBP does not execute the Arbitration

---

[5]   A "Current IBP" is an individual[] that, as of the date of preliminary approval, ha[s] a current, operative contract with either Defendant or one of their predecessors, subsidiaries, or affiliates for sales in sales areas in California or who were purchasing product in California or selling to customers in California." (*Id.* § 1.9.)

Agreement within the Response Deadline, then their Individual Settlement Payment will be distributed to a *cy pres* charity Feeding San Diego." (*Id.* § 5.1.)

### D.    Settlement Notice and Administration

The parties request that CPT Group, "an experienced class action settlement administrator who gave a favorable bid," be appointed Settlement Administrator. (Doc. No. 116-1 at 13–14, 26.)

No later than fourteen days after Preliminary Approval, Defendants will provide the Class Data to the Settlement Administrator. (Settlement § 4.2.1.) Within fourteen days of receiving the Class Data, the Settlement Administrator will send the Notice of Settlement to all Class Members by both first-class United States mail and email in both English and Spanish. (Doc. No. 116-1 at 14; Settlement § 4.2.2.) If any Notice is returned undeliverable, the Settlement Administrator will run a skip-trace within three court days and remail the Notice within three court days of obtaining the result. (Doc. No. 116-1 at 14; Settlement § 4.2.2.) The Settlement Administrator will also establish and maintain a website and toll free number where Class Members may access the Notice, the Settlement Agreement, and other relevant documents as well as have questions answered about the settlement process. (Doc. No. 116-1 at 14; Settlement § 4.2.3.)

Within fifteen days of Defendants funding the Qualified Settlement Fund, the Settlement Administrator will issue (1) Individual Settlement Payments to Participating Class Members, except for Current IBPs who have not yet signed an Arbitration Agreement, (2) Individual PAGA Payments to the PAGA Members, the LWDA PAGA Payment to the LWDA, any Court-approved attorneys' fees and costs to Class Counsel, and any court-approved Enhancement Award to the Class Representatives. (*Id.* § 4.9.2.)

In addition to managing distributions, the Settlement Administrator will provide weekly updates to Counsel for both parties as to the number of persons in the Settlement Class who submitted valid Opt-Out Requests, written Objections, Eligible Workweeks or Eligible Pay Period disputes, and executed Arbitration Agreements. (*Id.* § 4.6.) The Settlement estimates Settlement Administration Costs not to exceed $16,000. (*Id.* § 3.5.3.)

### E.    Objections and Opt-Out Procedure

The Settlement Agreement distinguishes between PAGA Members and Class Members with regard to objection and exclusion procedures. (*See id.* § 4.3.1.) PAGA Members are prohibited from objecting or opting out of the Settlement. (*Id.*) Class Members who want to opt out must timely submit a signed and dated written request to be excluded from the class portion of the Settlement to the Settlement Administrator ("Opt-Out Request"). (*Id.* § 4.3.1.) Participating Class Members may object to the Settlement by (1) mailing a written objection to the Court, (2) filing a written objection with the Court, or (3) appearing in person at the Final Approval Hearing. (*Id.* § 4.4.) The Response Deadline by which Class Members must file a written objection or submit an Opt-Out Request is forty-five calendar days after the Settlement Administrator mails the Notice of Settlement to Class Members. (*Id.* § 1.37.) If the initial Notice of Settlement is returned undeliverable, the Response Deadline will be the later of fifty-five calendar days from the initial mailing or fourteen days after the re-mailing. (*Id.*) Defendants retain the right to void the Settlement if 5% or more of Class Members opt out, the Court does not certify the Settlement Class, the Court does not approve the PAGA settlement, or other material adverse conditions occur. (*Id.* § 4.7.)

### F.    Attorneys' Fees, Costs, and Enhancement Awards

In the instant motion, as permitted by the Settlement, Plaintiffs represent that Class Counsel will seek "enhancement awards" of $15,000 for each named plaintiff, not to exceed $60,000, reimbursement of documented reasonable costs up to $45,000, and attorneys' fees not to exceed one-third of the Gross Settlement Amount. (Doc. No. 116-1 at 12–13; Settlement §§ 3.5.1–3.5.2.) However, the Settlement is not contingent upon approval of these requests. (*See* Settlement §§ 3.5.1 ("Any amount of the Class Representatives' Enhancement Awards that is not awarded by the Court shall be added to the Net Settlement Amount."), 4.8.4 ("Notwithstanding any other provision of this Stipulation, no order of the Court, or modification or reversal on appeal of any order of the Court, reducing the amount of any attorneys' fees or costs to be paid by Defendants to

Class Counsel, or reducing the amount of the Enhancement Award paid to the Class Representative, shall constitute grounds for cancellation or termination of the Stipulation, or grounds for limiting any other provision of the Judgment.").)

## III.    LEGAL STANDARD

A class action may only be settled with court approval. Fed. R. Civ. P. 23(e). "[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 895 F.3d 597, 606 (9th Cir. 2018) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003)); *see also Saucillo v. Peck*, 25 F.4th 1118, 1130 (9th Cir. 2022) ("[W]here the parties negotiate a settlement agreement before the class has been certified, settlement approval requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e).") (internal punctuation omitted).

## IV.    CONDITIONAL CLASS CERTIFICATION

Before granting preliminary approval of settlement agreement in a putative class action, the Court must first determine whether the proposed class can be certified. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620–21 (1997). "To obtain class certification, a class plaintiff has the burden of showing that the requirements of Rule 23(a) are met and that the class is maintainable pursuant to Rule 23(b)." *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010) (citing *Amchem*, 521 U.S. at 613–14). "When, as here, the parties have entered into a settlement agreement before the district court certifies the class, reviewing courts 'must pay undiluted, even heightened, attention to class certification requirements.'" *Staton*, 327 F.3d at 952 (quoting *Amchem*, 521 U.S. at 620).

Plaintiffs seek provisional certification of the putative Class under Federal Rule of Civil Procedure 23(b)(3).

///

### A. Rule 23(a) Factors

Pursuant to Rule 23(a), a representative party may sue on behalf of all members of a class only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—'effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

#### 1. Numerosity

First, the numerosity requirement is satisfied where "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[I]mpracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (citation omitted). "Although the Supreme Court has held that 'the numerosity requirement imposes no absolute limitations,' courts generally find this requirement satisfied when a class includes at least forty members." *Pena v. Taylor Farms Pac., Inc.,* 305 F.R.D. 197, 213 (E.D. Cal. 2015) (first quoting *Gen. Tel. Co. of Nw. v. E.E.O.C.*, 446 U.S. 318, 330 (1980), then citing *Rannis v. Recchia*, 380 Fed. App'x 646, 651 (9th Cir. 2010)) (cleaned up).

Here, the Settlement Class consists of approximately 290 current and former California IBPs based on Earthgrains's records. (Doc. No. 116-1 at 16; Settlement § 3.4.) The Court finds the numerosity requirement has been met.

#### 2. Commonality

Second, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members

22-cv-01269-AJB-AHG

'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 148). "What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (citation omitted) (emphasis in original).

The extent of Plaintiffs' analysis of commonality is: "One common question here is whether Class Members are Defendants' employees entitled to overtime, expense reimbursement, and other Labor Code rights. Resolution of this question using common proof (including common agreements and policies) could establish Defendants' liability." (Doc. No. 116-1 at 16–17 (citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012); *Ludlow v. Flowers Foods, Inc.*, No. 18CV1190-JO-JLB, 2022 WL 2441295, at *6 (S.D. Cal. July 5, 2022)).) Turning to the SAC, Plaintiffs detailed six additional common questions. (SAC ¶ 34.)

District courts throughout this circuit have found that commonality is met when, as here, the proposed class of plaintiffs asserts that a defendant misclassified its distributors as independent contractors instead of employees and resolution can be determined through common evidence of the defendant's overarching business structure, policies, and practices regarding the distributors. *See, e.g.*, *Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 290 (N.D. Cal. 2022) ("[T]he common misclassification contention is necessarily central to the labor code claims because no class member can recover if defendant's classification of unit franchisees as independent contractors was proper."); *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 477 (N.D. Cal. 2017) ("Plaintiffs satisfy the commonality requirement because whether Defendants misclassified its distributors as independent contractors under California law is a common question that is capable of common resolution for the class based on the Distributor Agreements that all putative class members signed."); *Alfred v. Pepperidge Farm, Inc.*, 322 F.R.D. 519, 538–39 (C.D. Cal. 2017), *modified*, No. LACV1407086JAKRZX, 2017 WL 5665019 (C.D. Cal. July 13, 2017) (collecting cases); *Ludlow*, 2022 WL 2441295, at *6.

22-cv-01269-AJB-AHG

Although the instant motion provides very minimal analysis, considering the common questions of fact and law alleged in both the motion and the SAC, the Court finds Plaintiffs have met the commonality requirement.

### 3.    Typicality

Third, the claims or defenses of the class representative must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[U]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Staton*, 327 F.3d at 957 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.") (citation omitted). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508.

Here, the claims of Plaintiffs, as current and former California IBPs, are typical of the claims of the absent Class Members because they arose from the same alleged conduct of Defendants, namely improperly classifying IBPs as independent contractors and, as a result, denying IBPs protections of California wage-and-hour laws. (*See* SAC ¶ 35; Doc. No. 116-1 at 17.) Plaintiffs and the other Class Members suffered the same type of injury as a result of this alleged conduct, and Plaintiffs' claims are reasonably co-extensive with those of absent Class Members. Plaintiffs have therefore satisfied the typicality prong.

### 4.    Adequate Representation

Finally, Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Serious conflicts of interest can impair adequate representation by the named plaintiffs, yet leave absent class members bound to the final judgment, thereby violating due process." *In re Volkswagen*, 895 F.3d at 607 (quoting *Hanlon*, 150 F.3d at 1020). "To determine whether the representation meets

this standard, we ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton*, 327 F.3d at 957. "Adequacy of representation also depends on the qualifications of counsel." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018). Specifically, "[t]he named representative's attorney must be qualified, experienced, and generally capable to conduct the litigation." *Id.* (cleaned up). "As to the latter question, the relevant inquiry is whether the plaintiffs maintain a sufficient interest in, and nexus with, the class so as to ensure vigorous representation." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (citation and internal punctation omitted).

Plaintiffs, who are "a mix of current and former IBPs who contracted with Earthgrains over various time periods," state that they "have no conflicts with the class" and that the requested service awards do not create a conflict. (Doc. No. 116-1 at 20; *see also* Markley Decl. ¶ 15.) Class Counsel has no conflicts with the interests of the class or otherwise that would prevent continued zealous representation (Markley Decl. ¶¶ 15, 29) and has extensive litigation experience in this niche of law (*id.* ¶¶ 16–28; Doc. No. 116-1 at 25).

Based on these assertions, the history of this litigation, and Class Counsel's experience, the Court is preliminarily satisfied that Plaintiffs' interests align with those of the proposed class, that neither Plaintiffs nor Class Counsel have any conflicts of interest, that Plaintiffs and their counsel have and will continue to vigorously prosecute the action on behalf of the class, and that Class Counsel is well-experienced with this type of litigation. However, the Court notes that the lack of conflicts between the Class Representatives and the Class is based on Class Counsel's knowledge, not declarations from Plaintiffs. To support a motion for final approval, Plaintiffs must submit declarations averring to a lack of conflicts directly. Thus, on record currently before the Court, the adequacy of representation requirement is conditionally satisfied.

///

22-cv-01269-AJB-AHG

### 5. Conclusion

Accordingly, the Court finds Plaintiffs have sufficiently demonstrated each of the four Rule 23(a) prerequisites for conditional approval.

### B. Rule 23(b) Factors

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem*, 521 U.S. at 614. Relevant here, pursuant to Rule 23(b)(3), "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1. Predominance

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc.*, 577 U.S. at 453 (citation omitted).

Plaintiffs argue "[t]here are common, predominate misclassification issues under California's employment tests" and "under the theories of recovery once Plaintiffs establish an employment relationship," specifically (1) "whether IBPs operate within the usual course of Defendants' direct-store-delivery business under Prong B," (2) "whether Defendants have the right to control them through common contracts, management structures, and store policies under Prong A," (3) "whether vehicle related expenses and various itemized amounts taken from IBPs' pay each week are reasonable and necessary

business expenses under Labor Code section 2802," and (4) "whether they should receive overtime under section 510." (Doc. No. 116-1 at 18.)

Considering both the individual and common questions of fact and law at issue here, the Court finds the predominance requirement is conditionally met. *See, e.g.*, *Salinas v. Cornwell Quality Tools Co.*, 635 F. Supp. 3d 954, 967 (C.D. Cal. 2022) ("The court agrees with Plaintiff that the question of Defendant's right of control over the Dealers is sufficiently uniform and subject to common proof to satisfy the commonality and predominance requirements for class certification."); *Roman*, 342 F.R.D. at 295 ("Here, common questions predominate under Prong B. Defendant classified all unit franchisees as independent contractors. It provided a standard franchise agreement to master franchisees, and master franchisees had a common practice of using that agreement as a template for their agreements with unit franchisees."); *Wilburg v. iVueit, LLC*, No. 24-CV-02642-AMO, 2025 WL 2459091, at *3 (N.D. Cal. Aug. 26, 2025) ("Here, common questions predominate because the issue of whether iVueit misclassifies its employees is susceptible to class-wide proof.").

### 2. Superiority

In determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," courts consider (1) the interest of class members individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability of concentrating the litigation of the claims in this particular forum; and (4) the manageability of the action as a class. Fed. R. Civ. P. 23(b)(3); *see also Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.), *as amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).

Plaintiffs argue that proceeding as a class action is superior because (1) "Class Members have little interest in individual control or separate actions (which are available if they opt-out), (2) "multiple actions would be costly, inefficient, and could lead to inconsistent results," (3) "[t]here is no other litigation involving IBPs in California," and

22-cv-01269-AJB-AHG

(4) "the Court is familiar with state wage claims." (Doc. No. 116-1 at 18.) Finally, Plaintiffs assert "there is no need for the Court to consider manageability for trial since the Parties are seeking to resolve the case." (*Id.*)

First, Plaintiffs fail to expressly explain *why* Class Members would have little interest in individually controlling the prosecution of separate actions. However, cobbling together Plaintiffs' arguments on cost and the lack of other litigation involving the controversy presented here, the Court infers that Plaintiffs are arguing that the cost and risks of litigating a misclassification claim balanced against the potential recovery would deter class members from pursuing individual prosecution. *See Zinser*, 253 F.3d at 1190 ("Where damages suffered by each putative class member are not large, this [first] factor weighs in favor of certifying a class action."). Second, there is no other pending litigation regarding the same controversy. Third, Plaintiffs fail to address whether and why concentration of the litigation in this particular forum is desirable. Finally, manageability need not be considered when considering certification in context of settlement. *See Amchem*, 521 U.S. at 620. The Court finds the first and second factors weigh in favor of superiority, the third factor is neutral, and the final factor is inapplicable. Considering that no other litigation concerning this controversy with IBPs in California has been commenced and the hard-fought, expensive nature of the instant litigation, the Court finds the superiority requirement of Rule 23(b)(3) met.

### C.   Conclusion

Because Plaintiffs have met each of the four requirements of Rule 23(a) and both of the requirements of Rule 23(b)(3), the Court certifies the Class for settlement purposes. The Court appoints Plaintiffs Tlaloc Munoz, Miguel Ruiz, Edgar Corona, and Steven Snavely as Class Representatives and Nicholas & Tomasevic, LLP, as Class Counsel.

///

///

///

///

## V. PRELIMINARY APPROVAL OF CLASS AND PAGA SETTLEMENT

Next, the Court must make a preliminary determination regarding whether the proposed settlement and notice are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1), (2). "Under this standard, district courts can neither rubberstamp the settlement nor unduly meddle in the parties' affairs." *In re Cal. Pizza Kitchen Data Breach Litig.* ("*In re CPK*"), 129 F.4th 667, 674 (9th Cir. 2025).

Traditionally, courts in this circuit assess the fairness, reasonableness, and adequacy of a proposed Rule 23 class settlement by balancing the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021). "The district court's approval order must show not only that 'it has explored [these] factors comprehensively,' but also that the settlement is 'not[] the product of collusion among the negotiating parties.'" *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (quoting *In re Mego Fin. Corp. Sec. Litig.* ("*In re Mego*"), 213 F.3d 454, 458 (9th Cir. 2000), *as amended* (June 19, 2000)).

In 2018, Rule 23(e)(2) was amended to require courts to consider whether:

> (A)    the class representatives and class counsel have adequately represented the class;
> (B)    the proposal was negotiated at arm's length;
> (C)    the relief provided for the class is adequate, taking into account:
>     (i)    the costs, risks, and delay of trial and appeal;
>     (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>     (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and
>     (iv)    any agreement required to be identified under Rule 23(e)(3); and

22-cv-01269-AJB-AHG

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

### A.    Rule 23(e)(2) Factors

The Court turns first to the Rule 23(e)(2) factors.

#### 1.    Adequacy of Relief

To determine the adequacy of the relief this Settlement provides Class Members, the Court will consider the amount of recovery in relation to the strength of Plaintiffs' case, the risks and expenses likely engendered by continued litigation, the requested attorneys' fees, and the effectiveness of the proposed distribution method. *See* Fed. R. Civ. P. 23(e)(2)(C).

##### i.    Amount of Recovery

"To evaluate the adequacy of the settlement amount, courts primarily consider plaintiffs' expected recovery against the value of the settlement offer." *In re Stable Rd. Acquisition Corp.*, No. 2:21-CV-5744-JFW(SHKx), 2024 WL 3643393, at *8 (C.D. Cal. Apr. 23, 2024). However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego*, 213 F.3d at 459 (quoting *Officers for Just. v. Civ. Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982)); *see also In re CPK*, 129 F.4th at 678 ("[C]ourts do not have a duty to maximize settlement value for class members.").

Here, the average net payment per Class Member is estimated to be $38,000. (Doc. No. 116-2 at 21–22; Markley Decl. ¶ 32.) Plaintiffs estimate Defendants' exposure to be $64 million, based on Plaintiffs' analysis of the data shared at the time of the mediation and after adjusting for realistic potential penalties and damage. (Doc. No. 116-1 at 22; Markley Decl. ¶ 33.) The Gross Settlement Amount of $17,500,000, therefore, represents roughly 27% of the estimated realistic exposures. (Markley Decl. ¶ 34.) Relying on their own litigation experience and monitoring of this field of law, Class Counsel views "accepting the mediator's proposal of $17.5 million along with the associated terms is a strong result for the class." (*Id.* ¶ 31; Doc. No. 116-1 at 7, 24.)

22-cv-01269-AJB-AHG

The settlement amount and its estimated recovery-to-exposure percentage are both within the range found reasonable by courts in this Circuit for similar cases. *See, e.g.*, *Alfred v. Pepperidge Farm*, No. LA CV14-07086 JAK (X), 2022 WL 17066171, at *8 (C.D. Cal. Mar. 4, 2022) (finding adequate a gross settlement amount of $22,699,473.10 for a class of 991 distributors asserting misclassification-based labor claims); *Alvarez v. XPO Logistics Cartage, LLC*, No. 218CV03736RGKE, 2021 WL 7285991, at *1, * (C.D. Cal. Oct. 8, 2021) (finding $20,000,000 gross settlement amount reasonable and adequate for a class of 561 truck drivers asserting misclassification-based labor claims); *Castro v. Paragon Indus., Inc.*, No. 119CV00755DADSKO, 2020 WL 1984240, at *14 (E.D. Cal. Apr. 27, 2020) (collecting cases approving settlements reflecting 12% to 35% of the estimated maximum recovery). As such, the amount of recovery weighs in favor of a preliminary finding of adequacy.

### ii. Strength of Plaintiffs' Case; Risk, Expense, Complexity, and Likely Duration; and Risk of Maintaining Class Action Status

When assessing "the costs, risks, and delay of trial and appeal[,]" Fed. R. Civ. P. 23(e)(2)(C)(i), courts in the Ninth Circuit evaluate "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; [and] the risk of maintaining class action status throughout the trial[.]" *Hanlon*, 150 F.3d at 1026. However, "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits . . . for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Just.*, 688 F.2d at 628. "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) (citation omitted).

Although "Plaintiffs very much believe in their case" (Doc. No. 116-1 at 21), the Settlement reaffirms that Defendants "deny any and all liability or wrongdoing of any sort

19

with regard to the claims alleged [and] make no concessions or admissions of liability of any sort" (Settlement § 2.2.3). Plaintiffs point to numerous risks they would have encountered if they proceeded with litigation. (*Id.* at 22–23.) Specifically, Plaintiffs pointed to the challenge of class certification, identifying cases where bakery delivery drivers, such as the Settlement Class here, were denied certification. (*Id.* at 22 (citing *Urena v. Earthgrains Distribution, LLC*, No. SACV1600634CJCDFMX, 2017 WL 4786106 (C.D. Cal. July 19, 2017); *Martinez v. Flower Foods, Inc.*, No. CV 15-5112 RGK (EX), 2016 WL 10746664 (C.D. Cal. Feb. 1, 2016)).) Plaintiffs also argue they "could have lost on the merits of the misclassification inquiry or they could be found to have limited damages based on overtime and meal and rest exemption and preemption theories." (*Id.* at 23.) Finally, Plaintiffs note that it is the prospect of appeals would have been likely based on the vigorous litigation history and prior interlocutory appeal. (*Id.*)

Balancing the uncertainty and delay of continued litigation of an action that is already four years old against the immediacy and certainty of settlement, the "costs, risks, and delay of trial and appeal" factors weigh in favor of a preliminary finding of adequacy. *See, e.g.*, *In re Anthem Inc. Data Breach Litig.*, 327 F.R.D. 299, 318 (N.D. Cal. 2018) ("Taken together, these circumstances suggest that further litigation would have been costly and uncertain and would have detrimentally delayed any potential relief for the Class. By contrast, the Settlement provides the Class with timely, certain, and meaningful recovery."); *Heid v. CyraCom Int'l, Inc.*, No. 22-CV-1445-MMA-KSC, 2024 WL 4008650, at *6 (S.D. Cal. Aug. 30, 2024) ("Given the risks and costs of continued litigation, the immediate reward to class/collective members through settlement is preferable."); *Thompson v. Costco Wholesale Corp.*, No. 14-CV-02778-CAB-WVG, 2017 WL 3840342, at *6 (S.D. Cal. Sept. 1, 2017).

### iii. Proposed Award of Attorneys' Fees and Litigation Costs

"Rule 23(e) makes clear that courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Briseno v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021).

20

22-cv-01269-AJB-AHG

"In a common fund case, such as this, the district court has the discretion to choose between either the lodestar or the percentage-of-fund methods when calculating fees." *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738 (9th Cir. 2016). "Under the percentage-of-fund method, the district court may award plaintiffs' attorneys a percentage of the common fund, so long as that percentage represents a reasonable fee." *Id.* (citing *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)). "The benchmark percentage is 25%, but, similar to the lodestar, the benchmark percentage 'can be adjusted upward or downward, depending on the circumstances.'" *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 784 (9th Cir. 2022) (quoting *Kim*, 8 F.4th at 1181); *cf. Stanger*, 812 F.3d at 738 ("Because there is a strong presumption that the lodestar amount represents a reasonable fee, adjustments to the lodestar are the exception rather than the rule.").

The Settlement Agreement provides that Class Counsel may apply to the Court for an award of reasonable attorneys' fees not to exceed one third of the Gross Settlement Amount, which is $5,833,333.33 and reasonable costs (Settlement § 3.5.2), which the Notice caps at $45,000 (Doc. No. 116-3 at 52–60, Notice of Settlement ("Notice"), at § 5). In the instant motion, however, Plaintiffs state that "Class Counsel will select a percent to ask of the Court at the final approval stage and justify that amount in more detail" but requests the Court to preliminarily approve one-third of the Gross Settlement Amount using the percentage of the fund amount. (Doc. No. 116-1 at 24.) To support this request, Plaintiffs point to "the strong result achieved for the class (a $17,500,000 non-reversionary common fund), the years of hard-fought litigation, including extensive motion and discovery practice, and the considerable risk undertaken by Class Counsel in prosecuting this case on a contingency basis." (*Id.*)

Plaintiffs' apparent stance that attorneys' fees and costs must only be analyzed by the Court on final approval,[6] and thus do not warrant substantive analysis, is distressing,

---

[6]    (*See* Doc. No. 116-1 at 24 ("A court *may* consider the reasonableness of the proposed fee award at the preliminary approval stage as part of its overall assessment of fairness.") (emphasis added).)

22-cv-01269-AJB-AHG

especially considering that Plaintiffs have intimated that they will be seeking an exceptional upward departure from the Ninth Circuit's benchmark. Class Counsel is cautioned that the requested attorneys' fees and litigation costs will be closely scrutinized as part of the motion for final approval and any future Rule 23(h) motion. *See McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021) ("[T]he district court has a duty to scrutinize the agreement for signs that the fees requested by counsel are unreasonably high."). To that end, in their subsequent motion, Class Counsel will be expected to provide:

(1)    detailed explanation for the requested attorney fees addressing all the Ninth Circuit's applicable factors;

(2)    documentation, such as billing records for all attorneys on the matter, to justify the requested attorneys' fees;

(3)    declarations addressing reasonableness of each attorney's hourly rate considering prevailing rates for counsel of comparable experience, skill, and reputation in the Southern District of California;

(4)    itemized records reflecting the requested litigation costs; and

(5)    relevant case law addressing reasonableness of the hours expended by attorneys, the hourly rate of sufficiently similar attorneys in this district, and each itemized litigation cost.

Due to the dearth of information provided at this time, and considering that Plaintiffs and Class Counsel are to address the Court's concerns at the final approval stage, this factor weighs neither in favor nor against a finding of adequacy.

### iv.    Effectiveness of the Proposed Distribution Method

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." 4 NEWBERG ON CLASS ACTIONS § 13:53 (6th ed. 2024).

Here, the claims process is straightforward as every Class Member who is a former IBP will automatically be included in the Settlement and receive a Settlement Payment without needing to take any action. (*See* Settlement § 3.5.4 ("There is no need for a

22-cv-01269-AJB-AHG

Participating Class Member to submit a claim form to be eligible for and to receive an Individual Settlement Payment.").) Rather, Class Members who are former IBPs only need to take action if they seek to be excluded from the Class Settlement, to contest their Covered Work Months, or to object to the Settlement. (Notice §§ 9, 12, 14.) Current IBPs must sign the Arbitration Agreement to receive a settlement payment. (Settlement § 3.5.4.) Each Notice will be individualized and pre-printed with that specific Class Member's Covered Work Months. (Notice §§ 6–7.)

Moreover, considering the timeline set out by the Settlement, Class Members will receive their Individual Settlement Payment and Individual PAGA Payment within approximately thirty-five days of the Settlement becoming effective. (Settlement §§ 4.9.1–4.9.2.) After 180 days, any uncashed settlement checks will be transmitted to the State of California, to be held and disposed of by the Controller in accordance with California's Unclaimed Property Law. (*Id.* § 4.10.) Distribution, both in method and timeline, is reasonable and relatively efficient. Thus, this factor weighs in favor of a preliminary finding of adequacy.

### v.    Conclusion

Considering the amount of recovery, the certainty that settlement brings, and the distribution method's efficiency, the Court finds the relief to be adequate, despite concerns regarding the lack of information provided about attorneys' fees, costs, and service awards. As such, the Rule 23(e)(2)(C) factor preliminarily weighs in favor of approval.

### 2.    Adequate Representation

Second, the court considers whether "the class representatives and class counsel have adequately represented the class[.]" Fed. R. Civ. P. 23(e)(2)(A). Plaintiffs and Class Counsel vigorously litigated the instant action over the span of nearly four years, successfully opposing a motion to compel arbitration before this Court and the Circuit and a motion for summary judgment. Additionally, as discussed *supra* § IV.A.4, based on the instant motion and declaration of Class Counsel attached thereto, there are no differences between or conflicts in Plaintiffs' claims and that of the Class beyond Plaintiffs seeking

22-cv-01269-AJB-AHG

service awards. Thus, the Court sees no reason Plaintiffs and Class Counsel will not continue to vigorously represent the Settlement Class. The Court finds that Plaintiffs and Class Counsel have preliminarily satisfied the adequacy requirement of Rule 23(e)(2)(A). *See In re Online DVD-Rental*, 779 F.3d at 943.

### 3.     Signs of Collusion

In reviewing the next Rule 23(e) factor, the Court must examine the Settlement for indicia of collusion that would undermine a prima facie arm's length negotiation. Signs of collusion may include (a) disproportionate distributions of settlement funds to counsel; (b) negotiation of attorneys' fees separate from the class fund ("clear sailing provision"); or (c) an arrangement for funds not awarded to revert to the defendants ("reverter provision"). *See Staton*, 327 F.3d at 965. If multiple indicia of implicit collusion are present, the district court has a heightened obligation to assure that fees are not unreasonably high. *Id.*

Here, the settlement was negotiated at arms' length with the assistance of Michael Russell, an experienced mediator, after extensive motion practice and complete class certification discovery. (Doc. No. 116-1 at 20–21.) The fact that the Settlement was reached with the assistance of experienced mediators suggests that the settlement is fair and reasonable. *See Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 620 (N.D. Cal. 2014) (noting that discovery and the use of a mediator "support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement"); *Cabrales v. Bae Sys. San Diego Ship Repair, Inc.*, No. 21-CV-02122-AJB-DDL, 2024 WL 4994339, at *12 (S.D. Cal. Dec. 5, 2024) ("The use of a mediator on two separate occasions to negotiate settlement and the exchange of discovery beforehand both support a conclusion that Plaintiffs were appropriately informed in negotiating a settlement, and that the settlement was not the result of collusion or bad faith by the parties or counsel."); *Lopez v. Velocity Transp. LLC*, No. 22-CV-1414-RSH-KSC, 2024 WL 4957565, at *6 (S.D. Cal. Dec. 3, 2024) (finding a settlement to be the product of "serious, informed, non-collusive negotiations" where it was reached through acceptance of a mediator's proposal after full-day negotiations and

22-cv-01269-AJB-AHG

extensive discovery).

Also, the parties did not identify any side agreements made in connection with the settlement. *See* Fed. R. Civ. P. 23(e)(3). There is no clear sailing provision or reverter provision. (Doc. No. 116-1 at 21; *see* Settlement § 3.3.) The Court preliminarily finds this factor weighs in favor of approval.

### 4.    Equitable Treatment of Class Members

As to the fourth and final Rule 23(e)(2) factor, the Court examines whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). This inquiry considers both (i) equity across sub-categories, or segments, of the class, and (ii) equity between class representatives and unnamed class members.

The Settlement provides that each Class Member will the same Minimum Payment, which will be equal for all Class Members. (Settlement § 3.5.4.) "Using a modest portion of the Net Settlement Amount for this purpose is fair because some of the claims at issue do not accrue based on weeks worked," so this "baseline amount . . . ensures [Class Members] obtain meaningful relief for their claims and should encourage a larger participation and check-cashing rate." (Doc. No. 116-1 at 23.) Additionally, each Class Member will receive a Pro Rata Payment directly proportional to the amount of workweeks that individual contracted with Defendants in California during the Class Settlement Period. (Settlement § 1.14.) Similarly, PAGA Members will receive an Individual PAGA Payment, consisting of a pro rata share based on the number of Eligible Pay Periods each PAGA Member was contracted with Defendants during the PAGA Settlement Period. (*Id.* § 3.5.5.) This system treats each Class Member both equally and equitably in turn across the Settlement Class. *See, e.g.*, *Cabrales*, 2024 WL 4994339, at \*14 (collecting cases where pro rata distribution based on workweeks found to be equitable); *Sanchez v. Mohawk Indus., Inc.*, No. 1:20-CV-1510 JLT EPG, 2024 WL 4556094, at \*20 (E.D. Cal. Oct. 23, 2024) (same).

As discussed *supra*, the Settlement Agreement treats the named plaintiffs differently from other Class Members by providing them with service awards in addition to their pro

22-cv-01269-AJB-AHG

rata settlement share. *See supra* § V.A.2. However, the named plaintiffs are also subject to an additional release as compared to the rest of the Class. Thus, the Court is preliminarily satisfied that the apportionment takes appropriate account of the differences between Class Members based on the duration of their employment during the applicable time period and the scope of the claims they are releasing.

### B.      Additional Ninth Circuit Factors

Because the amended Rule 23(e)(2) factors were not intended to replace the factors developed by circuits, the Court now turns to analyze the remaining factors traditionally considered by this circuit. *See McKinney-Drobnis*, 16 F.4th at 609 n.4 ("The amended Rule 23(e) did not 'displace' this court's previous articulation of the relevant factors, and it is still appropriate for district courts to consider these factors in their holistic assessment of settlement fairness."); *see* also Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

### 1.      Experience and Views of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). As such, "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529 (citation and internal quotation marks omitted).

Here, "[b]oth Parties are represented by experienced counsel and their mutual desire to adopt the terms of the proposed settlement, while not conclusive, is entitled to great deal of weight." *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007); *see also In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 588 (N.D. Cal. 2015) ("Class counsel has extensive experience prosecuting and settling class actions, including in the field of consumer privacy."). In addition to being familiar with the present dispute, Class Counsel has significant expertise in class action litigation, including worker misclassification cases, specifically. (*See* Markley Decl. ¶¶ 16–27.) This factor weighs in

favor of approval.

### 2. Reaction of Class Members

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quoting *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529).

At this preliminary approval stage, Class Members have yet to receive Notice of the Settlement. Plaintiffs note their intent to address this factor at final approval. (Doc. No. 116-1 at 24.) Accordingly, the Court will revisit this factor with the subsequent motion for final approval of settlement.

### 3. Presence of a Government Actor

Plaintiffs do not address this factor at all (*see generally* Doc. No. 116), likely because there is no government actor a party to the instant action. However, the Class Action Fairness Act ("CAFA"), pursuant to which the Complaint was brought, requires that, "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement[.]" 28 U.S.C. § 1715(b). "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *In re LinkedIn*, 309 F.R.D. at 588–89.

Here, based on statute and party agreement, notice of the proposed settlement is to be provided to the appropriate state and federal officials within 10 days for filing the instant motion (Settlement § 4.1.3). Accordingly, the Court will revisit this factor with the subsequent motion for final approval of settlement.

///

///

22-cv-01269-AJB-AHG

### C.   Cy Pres Recipient

"[*C*]y *pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)). "[A] district court should not approve a *cy pres* distribution unless it bears a substantial nexus to the interests of the class members" meaning that it "must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members." *Id.* at 821(cleaned up).

The Settlement Agreement identifies Feeding San Diego as the *cy pres* recipient. (Settlement §§ 4.12, 5.1.) Distribution to the *cy pres* recipient will occur (1) if the Reserve Fund Residue does not exceed $5,000 or (2) if a Current IBP does not execute the Arbitration Agreement within the Response Deadline. (*Id.*) However, the instant motion fails to address the appropriateness of Feeding San Diego. Although Feeding San Diego's mission to fight food insecurity is a worthy endeavor, the Court questions whether distributing residual "dough" to fight food insecurity has a substantial nexus to these bread distributers' employment misclassification suit or the objectives of the California Labor Code. In their motion for final approval, Plaintiffs are directed to explain why Feeding San Diego is an appropriate *cy pres* recipient or to specify a revised *cy pres* recipient and explain why the revised recipient is appropriate.

### D.   Settlement of PAGA Penalties Claim

As the Settlement additionally resolves Plaintiffs' PAGA cause of action, the Court must analyze whether the Settlement fulfils the statutory requirements of PAGA and is fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes. *See* Cal. Lab. Code § 2699(s)(2) ("The superior court shall review and approve any settlement of any civil action filed pursuant to this part."); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 972 (N.D. Cal. 2019) (identifying that district courts apply a "Rule 23-like standard" due to the absence of authority governing the standard for review and approval of PAGA settlements).

22-cv-01269-AJB-AHG

### 1. PAGA Statutory Requirements

Under PAGA's remedial scheme, civil penalties are distributed between "the aggrieved employees" (25%) and the LWDA (75%). *See* Cal. Lab. Code § 2699(i) (2022) (amended July 1, 2024).[7] The proposed settlement must be sent to the LWDA at the same time it is submitted to the court. Cal. Lab. Code § 2699(s)(2). Finally, aggrieved employees are prohibited from opting out of any settlement. *See Arias v. Superior Ct.*, 46 Cal. 4th 969, 986 (2009) ("Because an aggrieved employee's action under the Labor Code Private Attorneys General Act of 2004 functions as a substitute for an action brought by the government itself, a judgment in that action binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government."); *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) ("Thus, in a lawsuit which asserts a PAGA claims and seeks class certification for labor/wage claims, even class members who opt out of the class would be bound by an adverse PAGA judgment or settlement.").

First, the Settlement distributes the PAGA Payment appropriately with $262,500 or 75% to be paid to the LWDA and $87,500 or 25% to be distributed to PAGA Members. (Settlement §§ 1.29, 3.5.5; Doc. No. 116-1 at 25.) Second, in accordance with the statutory requirements, the Settlement mandates Plaintiff provide the Settlement Agreement to the LWDA. (Settlement § 4.1.2 ("Pursuant to California Labor Code § 2699(l), concurrently with the filing of the motion for preliminary approval, Plaintiffs will provide notice of the proposed Settlement to the LWDA.").) Upon motion for final approval, Class Counsel must confirm by declaration that provision 4.1.2 of the Settlement Agreement was fulfilled and provide the specific dates such action was taken. Third, the Settlement Agreement and Notice both clearly state that PAGA Members cannot opt out from the PAGA settlement.

---

[7] Effective July 1, 2024, civil penalties recovered by aggrieved employees are now allocated with 65% distributed to the LWDA and 35% to the aggrieved employees. Cal. Lab. Code § 2699(i) (2024). However, the amendment does not apply to the instant action as the complaint was filed prior to June 19, 2024. *See* Cal. Lab. Code § 2699(v)(1).

(Settlement § 3.5.5; Notice § 7.) Accordingly, the Court is preliminarily satisfied that the PAGA statutory requirements are met by the instant Settlement Agreement.

### 2.      Fairness, Adequacy, and Reasonableness of PAGA Payment

"[W]hen a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being 'fundamentally fair, reasonable, and adequate' with reference to the public policies underlying the PAGA." *Haralson*, 383 F. Supp. 3d at 971 (quoting *O'Connor*, 201 F. Supp. 3d at 1133).

As acknowledged by Plaintiffs, the amount allocated for the PAGA Payment is "relatively small" in comparison to the Net Settlement Amount. (*See* Markley ¶ 38.) However, Plaintiffs argue that the class claims, which have a four year statute of limitations, were stronger and held more value than the PAGA claims, which have a one year statute of limitations. (Doc. No. 116-1 at 25–26; Markley ¶ 38.) Additionally, Plaintiffs point out that, as structured, "the bulk of the Settlement goes to Class Members rather than the State via PAGA penalties," but the contribution to those penalties is a "meaningful amount." (Doc. No. 116-1 at 26.)

Though not expressly stated, it appears from Plaintiffs' argument that the PAGA Members are the same set of individuals as the Class Members, so this allocation provides more money in the pocket of the Settlement Class. Courts have approved the PAGA portion of a larger settlement in similar situations. *See, e.g.*, *Haralson*, 383 F. Supp. 3d at 972 ("[W]here the settlement of Labor Code claims under Rule 23 provides 'robust' relief to the class, it supports a greater reduction in PAGA penalties."); *Wells v. DCI Donor Servs., Inc.*, No. 2:21-CV-00994-CKD, 2024 WL 4436905, at *11 (E.D. Cal. Oct. 7, 2024) ("Though the PAGA payment will be much lower than the Rule 23 payments, this will ultimately benefit the class members, as PAGA's 75%/25% allocation would only shift funds away from the class members—who appear to be the same set of individuals as the PAGA members.").

22-cv-01269-AJB-AHG

Additionally, based on the Court's calculation, the PAGA Payment represents 2% of the Gross Settlement Amount, which is within the range of PAGA settlements approved by this Court and other district courts in California. *See e.g.*, *Rodriguez v. Danell Custom Harvesting, LLC*, 293 F. Supp. 3d 1117, 1133 (E.D. Cal. 2018) (approving a PAGA apportionment of 0.67% of the gross settlement fund because the LWDA did not object); *Cabrales*, 2024 WL 4994339, at *17 (approving a PAGA allocation constituting approximately 1% of the maximum settlement fund); *Van Kempen v. Matheson Tri-Gas, Inc.*, No. 15-CV-00660-HSG, 2017 WL 3670787, at *2 (N.D. Cal. Aug. 25, 2017) (approving allocation of $5,000, or approximately 1%, for PAGA claims out of the $370,000 total settlement fund); *Alcala v. Meyer Logistics, Inc.*, No. CV177211PSGAGRX, 2019 WL 4452961, at * 9 (C.D. Cal. June 17, 2019) (collecting cases in which courts approved PAGA allocations between 0% and 2% of the gross settlement amount).

Accordingly, the Court preliminarily finds the PAGA Payment to be fair, adequate, and reasonable considering it in relation to the Class recovery and to other approved PAGA settlements. At the final approval stage, Plaintiffs must expressly address whether the Class Members and the PAGA Members are coterminous.

### 3. Conclusion

Based on the foregoing, the Court is preliminarily satisfied that the Settlement meets PAGA's statutory requirements and is fair, adequate and reasonable.

### E. Enhancement Awards for Named Plaintiffs

Enhancement awards, also called service or incentive awards, are designed to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *but see Staton*, 327 F.3d at 975–78 (discussing conflicting interests for named plaintiff receiving service award). Although "[i]ncentive awards are fairly typical in class action cases," they are discretionary, *id.* at

22-cv-01269-AJB-AHG

958, and "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives," *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013). "[E]xcess incentive awards may put the class representative in a conflict with the class and present a 'considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations.'" *Rodriguez*, 563 F.3d at 960 (quoting *Staton*, 327 F.3d at 977–78).

In deciding whether to approve a service award, courts consider factors including "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *In re Online DVD-Rental*, 779 F.3d at 947 (quoting *Staton*, 327 F.3d at 977); *see also Ridgeway v. Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 1002 (N.D. Cal. 2017) (listing factors including risk to the representative, notoriety and personal difficulties encountered, amount of time and effort spent, duration of litigation, and personal benefit).

Here, the Settlement proposes a $15,000 service award for each of the four named plaintiffs in this action. (Settlement § 3.5.1.) In support of these awards, Plaintiffs argue that this request "amounts to less than 1% of the gross settlement amount (a mere .3%)," making it "in line with and even lower than other service awards granted by this Court and others in similar large recovery cases." (Doc. No. 116-1 at 20.) Additionally, Plaintiffs point out that the case was "vigorously litigated," with "extensive law and motion practice," warranting this amount. (*Id.*) Plaintiffs state that they "will further justify those at the final approval stage." (*Id.*)

The Court preliminarily approves a $15,000 service award for each named plaintiff, conditional upon further proof Plaintiffs assure will be provided at the final approval stage. In the parties' future motion for final approval and any corresponding motion for award of fees that includes the service award, the parties must provide a declaration from each named plaintiff that, *inter alia*, details the specific actions that individual took in furtherance of this litigation, estimates the hours expended on those tasks, and details any

specific risk they faced by prosecuting this action. Additionally, Plaintiffs must particularly justify why Snavely—who joined as a named plaintiff May 2, 2025, nearly three years after litigation was commenced by Munoz, Ruiz, and Corona—warrants the same service award for one-fourth of the time spent as a named plaintiff.

## F.   Settlement Administration

To ultimately approve a class action settlement, a district court must ensure class members were notified of the proceedings, had the opportunity to opt out or, for those who remain in the settlement, object to any of the settlement's terms, and were provided the chance to appear at fairness hearing. Fed. R. Civ. P. 23(c)(2), (e)(1), (e)(5). To effectuate these procedures, the parties have agreed to retain CPT Group. (Settlement § 1.41.) The Court approves and appoints CPT Group to administer notice and the Settlement. Additionally, the Settlement Agreement states the Settlement Administrator will be paid for *all* costs of administration out of the Gross Settlement Fund, which Plaintiffs currently estimate not to exceed $16,000. (*Id.* § 3.5.3.) Although concerned that the Settlement neither sets a maximum of administration costs nor limits costs to those reasonably incurred, the Court finds the estimated $16,000 Settlement Administrator costs preliminarily reasonable, subject to review of an itemized bill of costs actually incurred and costs to still be incurred at the Final Approval Hearing.

## G.   Form and Method of Proposed Notice

Rules 23(c)(2)(B) and (e)(1) generally require that a Rule 23(b)(3) settlement class should receive notice in a reasonable manner, and that the notice be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Amchem*, 521 U.S. at 617. Regular mail, electronic mail, and other appropriate means should all be considered. *See* Fed. R. Civ. P. 23(c)(2)(B). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). Additionally, as settlement was reached pre-certification,

the notice must also comply with Rule 23(c)(2). *See* Fed. R. Civ. P. 23(c)(B) (setting forth seven requirements for notice of a class certified pursuant to Rule 23(b)(3)).

Having reviewed the proposed Notice of Settlement and related notice plan, the Court concludes the Notice complies with Federal Rule of Civil Procedure 23. Accordingly, the Court approves the Notice in plan, form, and content. Efficacy of notice will be revisited at the Final Approval Hearing considering the final number of delivered notices as compared to the number of undeliverable notices and considering the number of Arbitration Agreements for current IBPs successfully submitted.

**VI.   CONCLUSION**

For the reasons stated above, the Court enters the following orders:

1.   **Conditional Class Certification**: The Court **GRANTS** Plaintiffs' request for conditional certification of the Settlement Class and **DEFINES** the Settlement Class as set forth *supra* § II.A. The Court **APPOINTS** Plaintiffs Tlaloc Munoz, Miguel Ruiz, Edgar Corona, and Steven Snavely as Class Representatives and **APPOINTS** Nicholas & Tomasevic, LLP, as Class Counsel.

2.   **Preliminary Approval of Settlement**: The Court finds, on a preliminary basis, that the proposed Class Settlement appears to be fair, adequate, and within the range of reasonableness. Accordingly, the Court **GRANTS** Plaintiffs' motion for preliminary approval of class settlement (Doc No. 116.)

3.   **Notice of Settlement**: The Court finds the proposed Notice (Doc. No. 116-3 at 52–60) to be consistent with the requirements of Rule 23 and due process to provide the best practicable notice under the circumstances. Accordingly, the Court **APPROVES** the proposed Notice.

4.   **Settlement Administration**: The Court **APPOINTS** CPT Group as the Settlement Administrator to supervise and administer the notice procedure in connection with the Settlement as well as the processing of claims set forth in the Settlement Agreement.

///

22-cv-01269-AJB-AHG

5.      **Briefing Schedule**: The motion for final approval of class action settlement and motion for attorneys' fees and costs must be filed and served on all parties no later than **October 1, 2026**. Responses—including either an opposition or a notice of non-opposition by Defendant (only with regard to any motion not filed jointly) and any Objections by Settlement Class Members—must be filed and served on counsel for all parties no later than **October 15, 2025**. Any reply by Plaintiffs must be filed and served on counsel for all parties no later than **October 22, 2026**. Plaintiffs' motions must also comply with the following:

The motion for final approval MUST:

- ADDRESS the concerns raised by the Court in the instant Order;
- ADDRESS when the CAFA Notice was served and upon whom it was served and INCLUDE AND ADDRESS any objections or responses received from the government officials;
- ADDRESS the actual efficacy of the Notice Program, as supported by data from the Settlement Administrator; and
- INCLUDE AND ADDRESS any Objections or responses received as of the filing date; and
- ADDRESS whether LWDA commented on the proposed settlement and INCLUDE LWDA's comments, if any.

In support of the attorneys' fees, costs, and class representatives' enhancement awards motion, Class Counsel MUST:

- ADDRESS the concerns raised by the Court in the instant Order;
- PROVIDE documentation detailing the number of hours incurred by attorneys in litigating this action, supported by detailed time records, as well as hourly compensation to which those attorneys are reasonably entitled;
- PROVIDE documentation itemizing and supporting the reasonableness of litigation expenses for which Class Counsel seeks reimbursement; and

///

22-cv-01269-AJB-AHG

- BE PREPARED to address any questions the Court may have regarding attorneys' fees, expenses, and service awards at the Final Approval Hearing.

6.    **Final Approval Hearing**: The Court sets a Final Approval Hearing on **Thursday, November 12, 2026**, at **10:00 AM** in Courtroom 4A, of the Edward J. Schwartz United States Courthouse, 221 W. Broadway, San Diego, CA 92101, to consider:

- Whether the proposed Class Settlement should be finally approved as fair, reasonable, and adequate;
- Whether Class Counsel's requested attorneys' fees and costs are reasonable;
- Whether Plaintiffs' enhancement awards are appropriate; and
- Whether the Settlement Administrator's expenses are reasonable.

**IT IS SO ORDERED.**

Dated:  July 16, 2026

_____
Hon. Anthony J. Battaglia
United States District Judge

22-cv-01269-AJB-AHG